## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,   :     1:18-cr-367
                          :
        v.            :     Hon. John E. Jones III
                          :
MATTHEW LYNN HUGHES, JR.   :
              Defendant.   :

## MEMORANDUM AND ORDER

### April 20, 2021

Presently pending before the Court is Defendant Matthew Lynn Hughes's

Motion to Suppress Identification of Mr. Hughes and Request for an Evidentiary

Hearing (the "Motion").  (Doc. 57).  We convened a hearing on August 18, 2020,

and, following post-hearing submissions, the matter has now been fully briefed,

(Docs. 57, 58, 76, 84, 88).  For the reasons that follow, the Motion shall be denied.

## I.    FACTUAL BACKGROUND

On October 31, 2018, Defendant Hughes was charged in a one-count

Indictment with being a felon in possession of a firearm in violation of 18 U.S.C.

§§ 922(g)(1) and 924(a)(2). (Doc. 1).  That charge arose from the alleged shooting

of Derek Dorsey near the York County Courthouse on March 7, 2018. (Doc. 70 at

8:1-19; Doc. 76 at 6; Doc. 84 at 4). Mr. Dorsey was a family member of Vernon

Cox, who, on that same day, was on trial at the York County Courthouse for

murdering Ryan Small. (Doc. 70 at 8:1-13; Doc. 76 at 6; Doc. 84 at 4). The Government alleges that Ryan Small was Defendant Hughes's brother. (*Id.*).

More specifically, the Government alleges that Mr. Hughes and an unindicted co-conspirator shot Mr. Dorsey in the leg at the intersection of North Duke Street and East Clark Avenue in York, Pennsylvania. (Doc. 70 at 9:22-23; Doc. 76 at 6; Doc. 84 at 4). While Mr. Dorsey was unable to identify his shooters, he did describe one of them as a "tall white male wearing a light-colored hoodie, which was pulled tight around his face." (Doc. 76 at 6; Doc. 84 at 4). There were several eyewitnesses[1] to the alleged crime, who indicate that that the perpetrators were "young, African American males, wearing dark clothing" and that they fled west on East Clark Avenue. (Doc. 84 at 4). The men were then further observed turning north onto North Howard Street and then East on Glen Place. (Doc. 84 at 5).

Following the shooting, York City police officers recovered surveillance video of the shooting from a camera located at 43 North Duke Street. (Doc. 70 at 10:2-3; Doc. 84 at 4). That video, which was shown during the evidentiary hearing held in this matter, depicted two suspects in dark clothing shooting at Mr. Dorsey before fleeing east on East Clark Avenue. (Doc. 70 at 11:18-20; Doc. 76 at 6; 84 at

---

[1]    Defendant Hughes's suppression motion is based in large part on the testimony of these eyewitnesses. Because we discuss each individual eyewitness's testimony below in the context of Defendant's arguments, we provide only a generalized overview of the purported facts at this juncture.

5). Police were also able to obtain video captured by two cameras located near the center of Glenn Place. (Doc. 70 at 13:11-16; Doc. 84 at 5). One of those cameras faced west and showed the intersection of North Howard Street and Glen Place. (Doc. 70 at 14:14-16; Doc. 84 at 5). That camera captured video of two men in dark clothing traveling north on North Howard Street before turning east onto Glen Place. (*Id.*). The second camera, which faced east, showed what appeared to be the same two men continuing east on Glen Place before crossing North Queen Street. (Doc. 70 at 14:25-15:3; Doc. 84 at 5).

Officers took video from the west-facing camera on Glen Place and created still photographs depicting the two alleged suspects. (Doc. 76 at 6; Doc. 84 at 6). Those videos and still photographs were shown to numerous eyewitnesses. (Doc. 76 at 7; Doc. 84 at 6). As described in more detail below, those eyewitnesses generally identified the men in the video as the suspects they had seen shoot Mr. Dorsey. (Doc. 84 at 6).

Separately, those videos and still photographs were circulated amongst York City police officers in an attempt to identify the suspects. (Doc. 76 at 7; Doc. 84 at 6). In what Defendant alleges was a "group identification," Detectives George Ripley, Timothy Shermeyer, Travis Sowers, and Tiffany Pitts identified one of the suspect as Matthew Lynn Hughes, Jr. (Doc. 76 at 7). The Government, on the other

hand, alleges that these officers independently identified the Defendant based upon their "previous interactions" with him. (Doc. 84 at 6).

After he was indicted on October 31, 2018, Defendant Hughes pleaded not guilty on November 6, 2018. (Doc. 11). Defendant Hughes filed the instant motion on May 8, 2020. (Doc. 57). He filed a brief in support at that time as well. (Doc. 58). On August 18, 2020 we held an evidentiary hearing on this matter. (Doc. 66). Following that hearing, we ordered post-hearing briefing from both parties. Defendant filed his post-hearing brief on January 6, 2021. (Doc. 76). The Government filed its post-hearing brief on February 23, 2021. (Doc. 84). Defendant Hughes replied on March 23, 2021. (Doc. 88). The matter is thus ripe for review.

## II.   DISCUSSION

Defendant Hughes makes three arguments in support of his Motion: (1) the use of still photographs and video surveillance in the civilian eyewitness identifications violated the Due Process Clause because it was overly suggestive; (2) the police officers' testimony impermissibly "usurps the jury's role as a factfinder" in violation of Federal Rule of Evidence 701; and (3) the police officer testimony should be excluded because the potential for unfair prejudice substantially outweighs its probative value per F.R.E. 403. (Doc. 76). We take each argument in turn.

4

**A. Eyewitness Testimony**

First, Defendant asks us to exclude the eyewitness testimony of five civilians who were shown still images and video surveillance taken from the area during the time of the shooting. (Doc. 76 at 10). In support thereof, he maintains that showing the eyewitnesses these images "impermissibly suggested that they were viewing the shooters." (Doc. 76 at 6). The Government disagrees, arguing that the testimony of these eyewitnesses is reliable notwithstanding any potential "show-up" procedures. (Doc. 84 at 8).

An identification procedure violates due process when it: (1) is "unnecessarily suggestive and (2) creates a substantial risk of misidentification." *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006) (citing *Manson v. Brathwaite,* 432 U.S. 98, 107, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). Unnecessary suggestiveness "contains two component parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." *United States v. Stevens,* 935 F.2d 1380, 1389 (3d Cir.1991). In that vein, "[a]s the Supreme Court has acknowledged, a show-up procedure[2] is inherently suggestive because, by its very nature, it suggests that the police think they have caught the perpetrator of the

---

[2]      A "show up" procedure is one in "which a single individual arguably fitting a witness's description is presented to that witness for identification." *Brownlee*, 454 F.3d at 138.

crime." *Brownlee*, 454 F.3d at 138. Neither party contests that the eyewitnesses in this case were subject to a "show up" identification procedure when they were shown still photographs and surveillance video of the suspected shooters. (Doc. 76 at 10; Doc. 84 at 9). And indeed, the circumstances surrounding these videos suggests that the police believed the men depicted in them were the shooters. The videos and still photographs clearly depict the geographic area in which the eyewitnesses saw the shooting occur, show the men running from the scene, and one of the videos actually depicts the shooting as it happened. Such circumstances are far more suggestive than a mere picture of a suspect's face, let alone a lineup of potential suspects.

Nevertheless, an eyewitness identification is not automatically suppressed when a procedure is unnecessarily suggestive. *Manson v. Braithwaite*, 432 U.S. at 113-114. Instead, we must look to the "totality of the circumstances," as dictated by the Supreme Court in *Neil v. Biggers*, to determine whether the identification was nevertheless reliable despite an unnecessarily suggestive procedure. 409 U.S. 188, 199-200, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401 (1972). Those factors include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Id.* We now consider the reliability of each civilian eyewitness within the context of these five factors, taking into account the totality of the circumstances surrounding their testimony.

### 1. Eric Zeiler

Mr. Zeiler lived in an apartment on the second floor of 111 East Market Street in York at the time of the shooting. (Doc. 70 at 50:13-14; Doc. 76 at 11; Doc. 84 at 11). At the evidentiary hearing, he testified that he heard several gunshots in rapid succession and looked out the window of his apartment to see two people running down Clarke Avenue before turning left onto Glenn Place. (Doc. 70 at 51:9-13; Doc. 84 at 11). He also testified that the men were wearing dark clothing and that he was unable to clearly see their faces. (Doc. 70 at 56: 24; Doc. 76 at 11; Doc. 84 at 11).

On the day of the shooting, Mr. Zeiler spoke with police officers approximately two hours after the shooting, during which time he identified the shooters as two black males. (Doc. 76 at 11; Doc. 84 at 10). A few hours later, Mr. Zeiler was again interviewed by the police, this time at the police station. (Doc. 70 at 56: 24-57:1; Doc. 76 at 11; Doc, 84 at 10). His account of the shooting remained unchanged. (*Id.*). However, the police also showed Mr. Zeiler still photographs taken from a surveillance video of the suspects and confirmed that they "looked about right." (Doc. 84 at 11). During the evidentiary hearing in this matter, Mr.

Zeiler was shown a surveillance video and confirmed that the individuals depicted appeared to be wearing the same clothing as the men he saw running from the scene of the shooting. (Doc. 70 at 55:4-7). He was also shown a still photograph of a suspect, whom he confirmed "definitely" appeared to be wearing the same clothing as one of the individuals he saw fleeing down Clarke Avenue. (*Id.* at 55:11-13).

Considering the relevant *Biggers* factors, we find Mr. Zeiler's testimony to be reliable. Mr. Zeiler testified that he had a clear view of two young men running down Clarke Avenue seconds after he heard several gunshots. (Doc. 70 at 51:11-13). And hearing a rapid succession of gunshots clearly focused his attention on the crime scene as well. (*Id.*). Furthermore, Mr. Zeiler provided a description of the suspects that did not change after he was shown video and still photographs. (Doc. 84 at 10-11). Indeed, Mr. Zeiler's account of the suspects' movements tracks with the flight path shown by various surveillance cameras, adding an additional layer of reliability to his testimony. (Doc. 70 at 52:14-53:14).

While Defendant argues that Mr. Zeiler's memory was "refreshed" by the still photographs, it is clear that he was able to provide a description of the men he saw before the "show-up" procedure was conducted. (Doc. 76 at 12). Finally, Mr. Zeiler presented as very certain of his identification at the evidentiary hearing, and he was questioned by police within hours of the shooting. (Doc 70 at 55:13). All of

these facts lead us to conclude that Mr. Zeiler's identification is reliable despite the use of a "show up" procedure. True, Mr. Zeiler cannot identify the Defendant as the shooter because he could not see the faces of the men running from the crime. It is also true that Mr. Zeiler did not actually witness the shooting itself. But these facts go to the *weight* of the evidence, not its reliability, and we will allow a jury to weigh the importance of Mr. Zeiler's testimony within the context of all other evidence presented at trial.

### 2.  Gregory Ellis

Mr. Ellis was interviewed by York City police a mere two hours after the shooting occurred. (Doc. 84 at 13). At that time, he stated that he was working outdoors on N. Duke Street when he heard several shots. (Doc. 70 at 75:5-10; 76:10-11). He told police officers that he saw two black males wearing black hooded sweatshirts run east on Clarke Avenue. (Doc. 70 at 21-24; Doc. 84 at 13). He also stated that one of the suspects had Adidas striping on his sleeve and that both suspects were "in their teens." (*Id.*). During the evidentiary hearing, Mr. Ellis testified that he met with the police multiple times after the day of the shooting. (Doc. 70 at 92:7-8). While he could not remember when he was shown the still photographs and video surveillance of the suspected shooters, he was certain that it was not until at least his second meeting with the police. (*Id.*).

In any case, Mr. Ellis was sure, and police records reflect, that he met with York City police the day after the shooting. (*Id.* at 91:15-18). During that interview, Mr. Ellis noted that he had not seen the shooting itself because of vehicles parked on the street, but that he heard the gunshots and observed two young, black males running east on Clarke Avenue. (*Id.* at 85:23-25).

At the evidentiary hearing in this matter, Mr. Ellis confirmed that the two individuals depicted in the still photographs and surveillance video were the suspects he saw fleeing the scene of the shooting. (*Id*. at 80:22-23). He also confirmed his identification of the suspects as "two people in dark clothing, one with three white stripes down the arm and white-like colored shoes" who ran east on Clarke Avenue. (*Id.* at 78:12-18). Upon viewing surveillance video of the shooting, He confirmed that the individuals depicted matched his memory of those he saw fleeing the scene. (*Id.* at 80:22-23).

Applying the *Biggers* factors to this testimony, we find Mr. Ellis's identification to be reliable despite the use of a "show-up" procedure. Defendant Hughes's main argument against such reliability is that Mr. Ellis did not describe the suspects as wearing light colored shoes until after he had seen the photographs and video surveillance. (Doc. 76 at 13). This indicates, he argues, that Mr. Ellis is testifying not from his own recollection, but what he was shown in his identification procedure. (*Id*.).

We do not think that this fact alone indicates Mr. Ellis's unreliability. To the contrary, Mr. Ellis was interviewed shortly after the shooting occurred, and his initial description has changed very little over time. (Doc. 70 at 80:22-23). Furthermore, it is clear from video surveillance that Mr. Ellis was present very close to the shooting and had ample opportunity to watch them flee the scene. (*Id.* at 77:9-12). Mr. Ellis testified that he was paying close attention to the suspects within seconds of the shooting and appeared relatively certain about his descriptions at the time they were given. (*Id.* at 86:7-18). Furthermore, his initial identification, indisputably given before he had seen any photographs or video, closely matches the suspects depicted on-screen. (Doc. 84 at 113-14). For all these reasons, we find Mr. Ellis's identification to be reliable. Again, the jury may give this testimony whatever weight they deem appropriate, but we will allow them to hear it.

### 3. Jason Richardson

Mr. Richardson was first interviewed by the York City police a mere two hours after the shooting. (Doc. 84 at 16). At that time, Mr. Richardson was driving a school van at the intersection of Duke and Market Streets when he saw two men in dark-colored hooded sweatshirts drawn tight around their faces. (Doc. 70 at 98:3-7). He told police that he saw men walk west on Clarke Avenue and cross over Duke Street while shooting west with black handguns. (*Id.* at 99:5-11). After

11

they fired multiple rounds, Mr. Richardson told police he saw the men run east on Clarke Avenue. (*Id.* at 99:13-16).

An hour after this initial interview, Mr. Richardson was again questioned by the police. (Doc. 84 at 16). During this transcribed interview, Mr. Richardson indicated that he was driving north on Duke Street when he saw two men with raised guns run onto Clarke Avenue. (G.E. 26 at 3). He further stated that the men were "wearing two dark-colored sweatshirts with hoodies pulled over their heads" and that they had "slender builds." (*Id.*). Mr. Richardson's testimony at the evidentiary hearing generally mirrored his prior statements, with a few key differences we note here. First, Mr. Richardson confirmed that he did not recall, nor did police records indicate, that he had told police about white Adidas striping on the sleeves of the suspects—though he could not remember if he had ever seen the men from the side. (Doc. 70 at 101:13-18). Second, Mr. Richardson confirmed that he could not recall if he was shown still photographs or video surveillance footage of the suspects at the time of his initial questioning. (*Id.* at 104:24-105:2).

Defendant Hughes asks us to exclude Mr. Richardson's identification on these two grounds. (Doc. 76 at 14-15). But Defendant Hughes bears the burden of showing that Mr. Richardson's testimony is not reliable in the face of an unnecessarily suggestive identification procedure. *See United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003). Here, we see no indication that he has done so.

Mr. Richardson's testimony has remained consistent over time, and he was interviewed in rapid succession after he witnessed the shooting in close proximity. True, Mr. Richardson exhibited some hesitation on the stand at the evidentiary hearing, but we do not believe that lack of confidence was, in significant part, related to his identification of the suspects. Instead, Mr. Richardson appeared uncertain regarding police procedure, namely whether they had shown him the photos and video surveillance.

Furthermore, he truthfully admitted that he could not recall whether he told police about the Adidas striping, but we find such a fact goes towards the weight of the evidence he may present, not his reliability. We are not convinced that Mr. Richardson was even shown the photos or video surveillance before providing his initial statements, and in any case the applicable *Biggers* factors here indicate that his identification was nevertheless reliable.

### 4. Shaun Desenberg

Mr. Desenberg was also working outdoors during the shooting. (Doc. 70 at 107:9). He was first interviewed the day after the incident, at which time he told police that he was standing on the street when he heard multiple gunshots and saw two black men wearing all black clothing. (Doc. 84 at 18-19). He also noted that one of the men had "something white" on his clothing. (*Id.*). Mr. Desenberg was shown still photographs of the suspects after providing this description. (Doc. 70 at

113:3-5). He could not recall if he was shown more than one photograph. (*Id.* at 113:6-8).

Defendant Hughes notes that Mr. Desenberg's description of the "something white" on one man's clothing solidified into an identification of "Adidas striping" only *after* he was shown depictions of the suspects, indicating that the material he viewed was unnecessarily suggestive and has tainted his identification. (Doc. 76 at 16). However, Mr. Desenberg did not borrow this fact from the photographs whole-cloth. Instead, he testified that the white he saw on one of the suspects was "the first thing that caught [his] eye." (Doc. 70 at 111:1). True, his description of this "something white" sharpened after he saw photographs of the suspects, but the salient fact of white coloring on dark clothing was present before Mr. Desenberg viewed any photographs or footage. (*Id.* at 113:3-5).

In addition, considering the other relevant *Biggers* factors, we note that Mr. Desenberg was interviewed within twenty-four hours of the shooting, that he testified to an unimpeded view of the suspects, and that his identification closely mirrored the men he was later shown in still photographs and video surveillance. Furthermore, Mr. Desenberg displayed a high level of certainty in his previous identification when questioned during the evidentiary hearing. (Doc. 70 at 11:1-8). These factors lead us to conclude that Mr. Desenberg's identification was reliable.

### 5. Michael Winand

Michael Winand was also working near the scene of the shooting. (Doc. 70 at 115:2-11). He was interviewed by York City police the day after the shooting, at which time he reported that he had heard gunshots, which caused him to open a window and look out. (Doc. 70 at 115:18-19; Doc. 84 at 20). At that time, he saw two suspects running down East Clarke Avenue (Doc. 70 at 115:24-116:1). He stated that they were both wearing black hooded sweatshirts "with possible red on the bottom" and were of average height. (Doc. 84 at 20). Police reports reflect that Mr. Winand did not mention Adidas striping in his initial interview. (Doc. 84 at 20-21). Mr. Winand was then shown photographs and surveillance video of the suspects and told police that he did *not* remember seeing white stripes on either man. (*Id.*).

Defendant Hughes argues that the "suggestive nature of showing Winand photographs and video of the suspects has impacted his ability to accurately recount what he observed." (Doc. 76 at 17). But we see the opposite. In the face of the allegedly "suggestive" photographs and video, Mr. Winand's description did not change. As Defendant Hughes notes in his brief, "after reviewing the video, Winand stated to police that he did not recall seeing white stripes on the jacket." (*Id.*). Thus, it appears that Mr. Winand continued to faithfully recount what he saw, and only what he saw, as regards the identification of the two alleged shooters.

This, combined with the accuracy of his remaining identification, the short time frame between the shooting and his interview by the police, his confidence in his identification, and his stated ability to see the men fleeing the scene, lead us to conclude that this identification was reliable. Defendant Hughes is welcome to cross-examine Mr. Winand on his ability to view the alleged crime or the perceived inconsistency between his testimony and the video surveillance, but we remain unconvinced that his identification has been rendered unreliable.

### B.  Police Officer Identifications

Next, Defendant Hughes asks us to exclude the identification testimony of four police officers. He makes three arguments in support thereof: (1) the officers engaged in an impermissible group identification of Defendant; (2) allowing the officers to offer their opinion of Defendant's identity based upon photographs and video surveillance usurps the jury's role as fact finder; and (3) the probative value of the officers' testimony is substantially outweighed by its prejudicial effect. (Doc. 76 at 17-32). We take each argument in turn.

### 1.  Group Identification

First, Defendant Hughes argues that Detectives Ripley, Pitts, and Perry made an impermissible group identification and should not be allowed to testify at his trial. (Doc. 76 at 17). He maintains that the video and photograph surveillance of the shooting was sent to York City police officers "en masse" and that the

testifying officers "are uncertain whether they made a group identification or whether identifications made were tainted as a result of the manner in which they occurred. (*Id.* at 19). Specifically, Defendant Hughes notes that Detective Ripley testified that he couldn't recall whether he identified the Defendant on his own or with help of others and that "[i]t could have happened a little bit of both ways, quite frankly," though he was certain that he viewed the surveillance video by himself. (Doc. 70 at 152:1-4, 10-15; Doc. 76 at 17). In addition, the Defendant points to the testimony of Detective Pitts, who recalled that Detectives Ripley and Shermeyer were present when she identified the Defendant, but couldn't recall if others were there as well, noting that "[i]t's a detective bureau, it's open." (Doc. 70 at 167: 14; Doc. 76 at 18). Finally, Defendant Hughes notes that Detective Perry could not recall whether other officers were present when he identified Hughes, but stated that he had not been told that other officers had identified him prior to drawing his own conclusions. (Doc. 70 at 188:16-18, 189:1; Doc. 76 at 18).

Defendant believes these alleged group identifications are impermissibly suggestive and points to a single nonprecedential case to support his contention. (Doc. 76 at 18 (citing *Brown v.* Blackburn, 625 F.2d 35(5th Cir. 1980)). Indeed, the Supreme Court has recognized that such identifications are "fraught with the dangers of suggestion." *United States v. Kermidas*, 332 F. Supp. 1312, 1320 (M.D. Pa. 1971), *aff'd sub nom. United States v. Rohland*, 468 F.2d 238 (3d Cir. 1972)

(citing *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149

(1967)). But even assuming that a group identification occurred here, the

Defendant still bears the burden of showing that there was a "substantial likelihood

of misidentification" under a *Biggers* analysis. *Biggers*, 409 U.S. 188 at 201. *See*

*also Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247

(1968).

Defendant Hughes cannot carry this burden. Each of the contested officers

testified that their identification was not influenced by the conclusions of others.

Detective Perry, for example, testified that he was not told that other officers

thought the suspect was Matthew Hughes until *after* he had made his own

identification. (Doc. 70 at 188:16-18, 189:1; Doc. 76 at 18). Detective Pitts also

testified that she was unaware that others had previously identified the Defendant.

Indeed, she testified that she was unaware that officers were even viewing footage

of the shooting—she stated that she happened to be walking by while the video

was playing and stated that she recognized Matthew Hughes. (Doc. 70 at 167: 17-

25). Finally, while Detective Ripley "could not recall" whether other officers made

independent identifications of the Defendant, he testified that he looked at the

images on his own. (Doc. 70 at 152:1-13). Thus, while it is plausible that rumors of

the Defendant's identification were circulating throughout the precinct, Defendant

has failed to show that the objected-to identifications were so unnecessarily

suggestive as to create a "substantial likelihood of misidentification." *Biggers*, 409

U.S. 188 at 201. Indeed, these officers testified credibly that they came to

independent conclusions regarding their identifications, and Defendant Hughes has

proffered no other reason to suggest that the procedure was unnecessarily

suggestive.

### 2. Lay Opinion Testimony

Next, Defendant Hughes asks us to exclude Detectives Dehart, Ripley, Pitts,

and Perry from testifying at trial because he believes that their opinions would

impermissibly invade the jury's fact-finding function. (Doc. 76 at 24). Lay

witnesses are permitted to provide their opinions if they are: (1) rationally based on

the witness's perception; (2) helpful to the jury; and (3) not based on scientific,

technical, or other specialized knowledge under F.R.E. 702. FED. R. EVID. 701. As

the Defendant notes, however, the rule is designed to exclude testimony "that

amounts to little more than choosing up sides, or that merely tells the jury what

result to reach." *United States v. Stadtmauer*, 620 F.3d 238, 262 (3d Cir. 2010).

Here, Defendant Hughes argues that he was "an individual who was under

constant open source surveillance" and that, as such, "it becomes difficult to suss

out how much each detective actually perceived themselves as opposed to blanket

exposure from a constant buzz which surrounded Hughes['s] suspected

criminality." (Doc. 76 at 28). Indeed, he maintains that "save Pitts, the other

officers had little, if any, familiarity with Hughes, other than in pictures and videos." (*Id.* at 28-29). Furthermore, Defendant Hughes argues that the law enforcement testimony is not helpful to the jury because all the officers "testified that Hughes' [*sic*] present appearance is not in any meaningful way different than when they last viewed him" and so "the jury will have the ability to view Hughes [. . .] and make their own comparison." (*Id.* at 29).

Thus, it appears that Defendant Hughes has focused his arguments upon the first two prongs of F.R.E. 701.[3] Third Circuit precedent has held that these two factors are necessarily entwined:

> "an opinion only qualifies as helpful 'if it aids or clarifies an issue that the jury *would not otherwise be as competent to understand*.' Lay opinion testimony that aids in the identification of suspects 'is particularly valuable where [. . .] the lay witnesses are able to make the challenged identifications based on their familiarity with characteristics of the defendant *not immediately observable by the jury at trial*.' In other words, 'lay witness testimony is permissible where the witness has had sufficient contact with the defendant to achieve a level of familiarity that renders the lay opinion helpful.'"

---

[3]     Defense counsel asked each officer if they had received training that would allow them to identify individuals "above and beyond what a normal lay person" could. (Doc. 70 at 25:3-7; 133:15-17; 163:1-3; **). Each officer answered that they had no specialized knowledge that would allow them to do so. (*Id.* at 25:7; 133:18-19; 163:4 **). The third prong of F.RE. 701 is thus uncontested.

*United States v. Fulton*, 837 F.3d 281, 297 (3d Cir. 2016) (emphasis included in original, internal citations omitted).[4] Thus, "the more familiar a witness is with a suspect's appearance, the more useful her identification testimony is to the jury. At least in theory, a witness who is intimately familiar with a defendant's appearance can perceive similarities and differences that jurors might not notice." *Id.* at 298.

In this vein, we consider each officer's testimony as it relates to their *prior* familiarity with the Defendant. First, Detective Dehart testified that he had personally interviewed Defendant Hughes in 2013. (Doc. 70 at 20:13-15). Since that time, Detective Derhart has also "seen and reviewed a number of videos [and]

---

[4]     In *Fulton*, the Third Circuit excluded the lay opinion testimony of two agents who sought to identify the defendant based upon surveillance footage of the robbery. In so doing, the court held that:

> Neither [Agent] Scartozzi nor Gomez had sufficient familiarity with the appearances of [Defendants] Barnes or Fulton to assist the jury here. Neither testified to any familiarity with Barnes or Fulton apart from this case. Gomez's in-person interactions with Fulton and Barnes were very limited and he did not interview Barnes until nearly two months after the robbery. Accordingly, he could not claim any familiarity with Barnes at the time of the robbery. Scartozzi's familiarity with Barnes and Fulton was even more attenuated. He did not meet Barnes until January 18, 2014, after Fulton's trial began. These minimal relations provided neither Scartozzi nor Gomez with familiarity with the defendant's appearance at the time the crime was committed, the defendant's customary manner of dress, or the defendant in a variety of circumstances. Accordingly, their opinion testimony was not helpful within the meaning of Rule 701(b). These agents were no better equipped than the jurors to compare the suspect's appearance with that of Barnes and Fulton.

*Fulton*, 837 at 299. As discussed below, each officer in this case had prior familiarity with the Defendant that provided them with the requisite ability to "perceive similarities and differences that jurors might not notice." *United States v. Fulton*, 837 F.3d at 298.

still shots from social media and [Y]outube." (*Id.* at 19:18-20). Detective Derhart

was also able to identify several different social media accounts under different

aliases that all represented the Defendant. (*Id*. at 21:2-18). Based upon this

familiarity with the Defendant, Detective Dehart maintains that he was able to

identify Matthew Hughes in the footage of the alleged shooting. (*Id.* at 22:15-24).

Detective Dehart had numerous prior interactions with Defendant Hughes, both in

person and virtually, that could allow him to "perceive similarities and differences

that jurors might not notice." *United States v. Fulton*, 837 F.3d at 298.

Consequently, we find that Detective Dehart "possesse[d] sufficiently relevant

familiarity with the defendant *that the jury [could not] also possess*" such that lay

opinion testimony identifying the Defendant is both rationally based upon the

witness's perception and is helpful to the jury. *Id.*

    The same can be said for Detective Ripley who, while he had never met

Defendant Hughes face-to-face before the alleged shooting, testified that he had

"researched [Defendant Hughes], looked at his arrest booking records through

JNET, our database for photographs for bookings, verified that's who this person

was, and then went ahead and monitored activity through various social media

platforms that he was involved in, open source information through social media

platforms" in connection with several other prior investigations. (Doc. 70 at 123:

12-17). Detective Ripley also indicated familiarity with Defendant Hughes's social

media aliases. (*Id*. at 124:15-17). We find that this knowledge is sufficiently helpful to the jury. Detective Ripley was familiar with the Defendant before the shooting, and had personally seen multiple pictures and videos of him that would allow him to "perceive similarities and differences that jurors might not notice." *United States v. Fulton*, 837 F.3d at 298.

Detective Pitts was the officer most familiar with Defendant Hughes before his arrest in this case, and we believe her opinion would prove helpful to the jury. During the evidentiary hearing, Detective Pitts testified that the encountered the Defendant face-to-face four separate times. (Doc. 70 at 154:25; 155:23-156:6; 156:13-20; 156:21-24). During one of these meetings, she collected a DNA sample, while during others she was present when he was arrested. (*Id*.) Detective Pitts also stated that she was familiar with the Defendant's social media accounts and associated aliases. (*Id*. at 11-18). Indeed, when Mr. Small was shot, Detective Pitts testified that the Defendant's family asked her to contact York County Prison regarding Defendant Hughes. (Doc. 70 at 159: 9-25). These circumstances indicate a high level of familiarity with the Defendant, based upon personal encounters, which we believe will prove helpful to the jury. Detective Pitts is well-situated to notice subtle similarities and differences between the video surveillance and the Defendant, and we will allow her to present her identification to the jury.

Finally, Detective Perry testified that he was assigned as a school resource officer in the York City School District from 2013-2015. (Doc. 70 at 174:4-5). During that time, the detective testified that there were several "incidents" involving the Defendant, which brough the Hughes to his attention. (*Id*. at 174:11-15). While Detective Perry acknowledged that he had never had a face-to-face encounter with the Defendant, he stated that they had passed each other in the halls and that the Defendant was the subject of "regular intelligence briefs" that included photographs and other information. (*Id.* 174:11-175:9). Specifically, Detective Perry testified that he was the affiant on a citation against Defendant Hughes in 2014, at which time each witness identified the Defendant. (*Id.* at 175:12-176:2).

We believe these interactions familiarized Detective Perry with the Defendant's appearance and mannerisms such that his testimony will prove helpful to the jury. He, like all the other officers anticipated to testify at trial, are able to do far more than compare the Defendant's current appearance to the surveillance videos and still photographs. Indeed, he, and the other officers, possess personal knowledge of the Defendant from various sources, each independently obtained, which will allow them to draw conclusions that the jury would be unable to make on their own. As such, we find that each officer's testimony satisfies F.R.E. 701.

### 3.  F.R.E. 403

Finally, Defendant Hughes asks us to exclude law enforcement testimony
under F.R.E. 403, arguing that the requisite foundation for their testimony would
"necessarily entail police-related interactions with Hughes [. . . and] open source
observations" of the Defendant which are unnecessarily prejudicial. (Doc. 76 at 30-
31). As the Government notes, the Third Circuit has urged us to "explicitly engage
in some 403 balancing on the record" to evaluate this claim. (Doc. 84 at 34 (citing
*United States v. Heinrich*, 971 F.3d 160, 163 (3d Cir. 2020))). As such, we note the
following:

The objected-to officer testimony is highly probative. One of the key issues
the jury will have to decide in this case is whether Defendant Hughes is the
individual depicted in the surveillance video and still photographs of the shooting.
And the officers at issue have personal experience which allows them to identify
the Defendant as one of those suspects. As the Government notes, "[t]he officers
have seen the Defendant in person and through video. They have seen how he
moves, how he interacts with people, and even how those movements and
interactions appear on video." (Doc. 84 at 34). As such, the officers' testimony
"tends to demonstrate the proposition which it [will be] admitted to prove" and is
"directly at issue in this case." *United States v. Herman*, 589 F.2d 1191, 1198 (3d

Cir. 1978). Consequently, we find the probative value of this evidence leans heavily in favor of admission.

We must also consider the prejudicial effect of this evidence. We begin by noting that all evidence is, in some respect, prejudicial to someone. At issue here is whether its probative value is "substantially outweighed by a danger of ... unfair prejudice, confusing the issues, [or] misleading the jury." *United States v. Heinrich*, 971 F.3d 160, 163 (3d Cir. 2020). Any mention of the details of the Defendant's prior interactions with law enforcement would certainly be prejudicial, as it implies that the Defendant "committed or was suspected of committing multiple crimes over a period of years." (Doc. 76 at 31). We will not allow any such implication that the Defendant is guilty of the present charge based upon prior interactions with law enforcement. However, we believe this prejudicial effect can be sufficiently ameliorated by a subsequent, pre-trial order in limine. We need not dictate specific limiting instructions at this early juncture, but are confident that, at the appropriate time, we can fashion appropriate protections to ensure that the prejudice at issue here is sufficiently lessened.

As such, Detectives Dehart, Ripley, Pitts, and Perry will be permitted to testify at trial to identify the Defendant, though we may limit their testimony at a later date. We believe that the highly probative nature of this testimony outweighs

any potential prejudice, especially considering the limitations we are prepared to put in place at the appropriate time.

### III.   CONCLUSION

For the reasons stated above, we will deny the Defendant's Motion to Suppress Identification of Mr. Hughes. (Doc. 57).

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion to Suppress Identification of Mr. Hughes, (Doc. 57), is **DENIED**.

2. This matter is hereby **SCHEDULED** for jury trial on **May 4, 2021 at 9:30 a.m.** in a courtroom to be determined, Harrisburg Federal Courthouse.

<u>s/John E. Jones III</u>
John E. Jones III, Chief Judge
United States District Court
Middle District of Pennsylvania